**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff<br><br>     v.<br><br>BROOKE WATERS,<br>          Defendant. | Criminal Action No. 23-35 FILED<br><br>MAY 1 8 2023<br><br>U.S. DISTRICT COURT DISTRICT OF DELAWARE |

## UNITED STATES' MEMORANDUM IN SUPPORT OF DETENTION

Over the course of at least six years, Brooke Waters ("WATERS") and her co-defendant, Clifton Gibbs ("GIBBS"), manipulated and coerced thirteen vulnerable victims into commercial sex and labor by using the victims' fear of opiate withdrawal, as well as physical violence—including sexual assault—control over housing, movements, finances, and communications, verbal abuse and humiliation, brandishing a firearm, and threats of serious harm to them and their families, all for the Defendants' financial benefit. The Defendants have been charged with nine counts of sex trafficking, six counts of forced labor, and one count each of interstate travel for the purposes of prostitution. Based on the charges, there is a rebuttable presumption that there are no conditions or combination of conditions which can reasonably assure the appearance of the Defendant or the safety of the community if she were to be released. The government contends the presumption stands and therefore seeks the pretrial detention of Defendant WATERS.

### I. Background of Investigation

Homeland Security Investigations ("HSI") opened the investigation into GIBBS and WATERS when police encountered the Defendants with Victims 5 and 6[1] in Ocean City,

---

[1] The government refers to the Victims herein as they are referred to in the Indictment.

Maryland in February 2015.   GIBBS, WATERS, and Victim 5 were arrested for drug possession, and all three, plus Victim 6, participated, in voluntary interviews with local police and an HSI Special Agent.   Both Victims told law enforcement that GIBBS and WATERS posted advertisements with photos of them on Backpage.com ("Backpage") for commercial sex, in exchange for GIBBS and WATERS providing them with drugs and a place to stay.   When GIBBS was shown recent Backpage advertisements of Victim 5 and Victim 6, GIBBS admitted that the photos appeared to be taken inside his home at 32287 Jimtown Road, but claimed that he did not know who took the photos and denied any involvement in prostitution activities.   These initial statements by Victims 5 and 6, however, raised suspicions that GIBBS and WATERS might be coercing the women to engage in commercial sex.

HSI encountered GIBBS again when he was arrested with Victim 4 in January 2016, after an undercover police officer responded to a Backpage advertisement for Victim 4 in Salisbury, Maryland.   A now-deceased victim was also arrested in an unrelated police operation the same night for solicitation-related charges.   An HSI special agent participated in the separate interviews of both Victim 4 and the deceased victim, who died from a suspected heroin overdose in 2017.   Victim 4 initially denied that the Defendants were forcing her to engage in commercial sex, although years later she contacted that same HSI agent and the National Human Trafficking Hotline to disclose that she believed she had, in fact, been trafficked by the Defendants, but had been too afraid to disclose her victimization in 2016.   The deceased victim, however, explained that she used to work for the Defendants and told a story similar to that of Victims 5 and 6.   She also provided the names of other women she knew to have worked for the Defendants under similar circumstances.   After interviewing several of the women identified by the deceased victim, HSI

contacted the U.S. Attorney's Office and the Human Trafficking Prosecution Unit of the Department of Justice, and the two offices began working with HSI to investigate the matter.

The investigation identified many potential victims but due to various potential victims' overdose deaths, relapses, medical and mental health complications, homelessness (which made keeping in touch with the victims nearly impossible), and general lack of cooperation in the years following the 2016 Salisbury incident, the investigation waned as HSI did not hear about GIBBS or WATERS continuing their criminal conduct.

The tide began to turn in 2018, however, when local law enforcement alerted HSI to a group of women with connections to GIBBS and WATERS – Victims 8 and 10 and another potential victim – all of whom were involved in a string of retail thefts.   Through interviews of the other victim and Victim 8, agents learned that GIBBS and WATERS were using the same coercive methods they employed against the prior sex trafficking victims to compel these victims to commit thefts of expensive goods for the Defendants to resell – a practice the victims referred to as "boosting."   Victim 8 also disclosed that she was coerced into doing commercial sex dates at GIBBS' Dusty Road property—a fact that was independently corroborated by Victim 10.   The investigation further intensified in January 2021 when Victim 4 called the National Human Trafficking Hotline to report being trafficked by the Defendants.

Over time, many of the victims have entered addiction recovery programs, moved away from Delaware, gained education/employment, and otherwise stabilized their difficult lives. Thus, with the highest concentration of stable, cooperative victims since the investigation began, the government presented its case to the grand jury, who true billed the seventeen-count indictment against the Defendants in April 2023.

## II.     Legal Standard

Detention is warranted when there is clear and convincing evidence that there are no conditions or combination of conditions which can reasonably assure the safety of the community or other persons.   18 U.S.C. § 3142(e) and (f).   In this case, a rebuttable presumption exists that there are no conditions or combination of conditions which can reasonably assure the appearance of the Defendant[2] and the safety of the community, given that the Defendants are charged with nine counts of sex trafficking and six counts of forced labor—15 out of the 17 charges in the Indictment.   Each of those 15 counts carries the presumption.   *See* 18 U.S.C. § 3142(e)(3)(D) (imposing a presumption of detention for Chapter 77 offenses carrying a maximum term of imprisonment of 20 years or more); *see also* 18 U.S.C. §§ 1589(d) (maximum of 20 years' imprisonment); 1591 (mandatory minimum of 15 years' imprisonment and maximum of life). Assuming the Defendant sufficiently rebuts the presumption as to both risk of nonappearance and risk of danger to the community, the Court must then consider four factors in determining whether detention is warranted: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any other person or the community should the defendant be released.   18 U.S.C. § 3142(g).   Here, each factor weighs in favor of detention.

## III.     Why Detention is Warranted

Given the nature of the offenses, the weight of the evidence, the known history and characteristics of the Defendant, and the significant risk posed to victims, witnesses, and their

---

[2] Assuming this presumption is sufficiently rebutted, the government is not otherwise seeking detention on this basis.   A finding that no combination of conditions exists to ensure the appearance of the Defendant must be supported by a preponderance of the evidence.

families, there are no conditions or combination of conditions which can reasonably assure the safety of the community or specific persons, namely the Victims and witnesses in this case.

    a.  <u>Nature and Circumstances of the Offenses</u>

        i.  *The Offenses*

The law is tilted in favor of detention at the outset of this case simply due to the nature of the charges.   WATERS is charged with nine counts of sex trafficking, six counts of forced labor, and one count of Mann Act violations.   The grand jury found there was probable cause to believe that the Defendants violated 18 U.S.C. § 1591 by (1) knowingly recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining Victims 1 through 9; (2) knowing or in reckless disregard of the fact that force, threats of **force, fraud, coercion**, or any combination of such means, would be used to cause Victims 1 through 9 to engage in a commercial sex act; and (3) that their conduct was in or affecting interstate commerce.   18 U.S.C. § 1591(a)(1) (emphasis added). Coercion is defined to include "threats of serious harm to, or physical restraint against, any person" or "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in **serious harm** to or physical restraint against any person."   18 U.S.C. § 1594(e)(2) (emphasis added).   Serious harm further defined as "any harm, whether physical or nonphysical . . . that is sufficiently serious, under all the surrounding circumstances, to *compel a reasonable person of the same background and in the same circumstances* to perform or to continue performing commercial sexual activity."   18 U.S.C. § 1591(e)(5) (emphasis added).[3]

---

[3] In *United States v. Mack*, 808 F.3d 1074, 1081 (6th Cir. 2015), the court found sufficient evidence of coercion through evidence that the defendant used the victims' preexisting drug addictions to "coerce[] the victims into prostituting themselves by initially supplying them with drugs under the pretense that they were free…When he suddenly cut them off and demanded payment, he exploited their addiction, which his previous supply of free drugs had cultivated."   *See also United States*

The grand jury further found that there was probable cause to believe that the Defendants violated 18 U.S.C. § 1589 by knowingly providing or obtaining the labor or services of Victims 8 through 13 by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; and/or (4) any scheme, plan, or pattern intended to cause the person to believe that, if they did not perform such labor or services, they or another person would suffer serious harm or physical restraint.  18 U.S.C. § 1589(a)(1)-(4).  Under that statute, "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to *compel a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2) (emphasis added).

In sum, these crimes are so serious and so dangerous that the law presumes there will be no conditions or combination of conditions that can reasonably assure the appearance of the defendant and the safety of the community.   The nature and circumstances of how the Defendants executed these offenses, as set forth below, weigh heavily in favor of detention.

---

v. Bixler, 2022 U.S. App. LEXIS 2646 at *20 (6th Cir. Jan. 27, 2022) (finding that serious harm "can include physical and psychological harm incurred from severe drug withdrawal."); *United States v. Arnold*, 2020 WL 618632, at *8 (M.D. Pa. Feb. 10, 2020) (holding that, where the defendant "intentionally exploited the heroin addictions and withdrawal symptoms of some of his victims by withholding heroin from them until they went on dates," a reasonable jury could find that defendant "effected his sex trafficking activities through coercion by exploiting the drug addictions of victims to compel them to engage in commercial sex acts in order to avoid serious psychological and physical harm.")); *United States v. Fields*, 2013 WL 11318863, at *3 (M.D. Fla. Dec. 11, 2013) (upholding § 1591 conviction, claiming that the defendant "cannot defeat his prosecution through the very traits of his victims that he sought to exploit [*e.g.*, drug addiction], because those traits comprised the victims' 'backgrounds' and 'circumstances' in evaluating the seriousness of Defendant's threatened harm" of drug withdrawal.).

6

ii. *The Conduct*

As the Victim testimony and corroborative evidence will establish, WATERS was GIBBS' "right hand" woman and as such, she often directly effectuated the criminal conduct described in the Indictment.   The testimony of the Victims will establish that the Defendants' coercive scheme targeted young, vulnerable individuals, primarily women, who were experiencing homelessness/financial instability and, most importantly, drug addiction, and coerced them to engage in commercial sex acts and/or labor through the threat of serious harm, including that of drug withdrawal illness and homelessness.   All of the Victims were drug addicts who were actively using heroin or cocaine – or were in the early stages of recovery – when Defendant GIBBS recruited them.   Additionally, all of the Victims were experiencing additional vulnerabilities, such as poverty, joblessness, homelessness, or physical trauma (e.g., sexual abuse, intimate partner violence, injuries, and illness).

GIBBS met and recruited all the Victims by one of the following methods: asking current Victims or potential victims about their female friends; searching known drug locations, like trap houses in known drug neighborhoods; meeting the Victims at other locations, like gas stations and diners, and inquiring about their drug use; and reaching out to women via social media, primarily Facebook.   Regardless of where he found the Victims, his initial conversations with them included three important topics: (1) a discussion of their drug use; (2) how they paid for their drugs; and (3) their current living situation.   GIBBS would then attempt to continue the conversation from his home on Jimtown Road, or at one of the properties to which he had access, including property on Dusty Road.   Once the Victims were on GIBBS' properties—many of which are in rural, more isolated areas—he gave each of them drugs "for free" (with no money

exchanged) and promised them they would be "taken care of," meaning that he would supply more drugs, as well as housing and food.   For the Victims, that promise initially sufficed to have them stay with GIBBS.

After each Victim had been with defendant GIBBS for a period of time, usually a few days, he would tell them that the drugs, housing, and food were "not free."   Knowing that the Victims had no money to pay, GIBBS would instruct them to perform commercial sex dates, boost, or do manual labor for him.   He introduced them to WATERS, who would photograph the Victims, often in dresses or lingerie, and post them on Backpage.   WATERS would also manage and instruct the Victims on the labor they were to provide, including by giving them lists of items to boost for the Defendants.   GIBBS and WATERS took all the money from the commercial sex dates, kept all the boosted items (many of which they resold), and had the Victims perform labor, including manual labor, panhandling, childcare, house cleaning, and trash burning, on GIBBS' properties solely for the Defendants' benefit.   On the rare occasion that GIBBS and WATERS allowed the Victims to keep money they earned, GIBBS then required them to pay cash for drugs (drugs the Victims needed to avoid withdrawal sickness) and/or rent to stay on his property; the amounts he charged were generally the same, if not more, than the amounts the Victims had earned that day.   Thus, all the money returned to GIBBS and WATERS.

The Defendants would give many of the Victims heroin (known to be a "downer" drug) at night before going to sleep, and cocaine, crack, or crystal meth (known to be "upper" drugs) before working.   GIBBS would often withhold drugs until the work was complete.   If the work was not done to his satisfaction—i.e., not enough dates, boosted items, or labor—he would withhold drugs, which would induce withdrawal sickness, also known as "dope sickness."   Many Victims said

that while GIBBS would ask them how much drugs they needed to avoid getting dope sick, he would rarely give them that amount so that they were consistently just barely recovering from dope sickness, and hovering just above the line of being dope sick again.   All of the Victims feared opiate withdrawal, and explained the symptoms as severe flu-like symptoms, gastrointestinal issues, and neurological symptoms that felt like "creepy crawlers" under the skin.   The sickness was severe enough to make at least one of the Victims want to scratch her skin off.[4]

In addition to withholding drugs, GIBBS used threats of physical violence (including brandishing a firearm), actual physical violence, sexual assault, emotional abuse, and threats of other types of harm to coerce the Victims into continuing to labor on their behalf.   WATERS often belittled the Victims, referring to them as junkies or as "replaceable."   Similarly, GIBBS called the victims "pitiful, stupid junkie" or "lazy junkie bitch."   Multiple victims and witnesses told HSI that GIBBS choked them.   Victim 12 told investigators that, in 2020, GIBBS punched her in the side of the head with a closed fist after she took one of his cars to buy drugs from another dealer, because she became dope sick and GIBBS would not provide her heroin.   Victim 12 said that soon after, GIBBS also choked her twice.   Victim 9 told investigators that she witnessed GIBBS punch Victim 12, and that this made her fear that he would physically assault her as well. Victim 10 also stated she was struck by GIBBS.   Victim 5 told investigators that GIBBS raped her on more than one occasion.   Victim 4 relayed that GIBBS raped and choked her, and Victim

---

[4] Victim 10 described her fear of opiate withdrawal by saying that with heroin addiction, "it gets to where you can't function without it."   When Victim 10 was in withdrawal, she said that she had "creepy crawlers on the skin, hot and cold flashes, knots in [her] stomach, vomiting, diarrhea ... a very severe stomach issue as you would have going on to where you just can't move, [and] hot and cold sweats."   She said that it is "excruciating," and she would not "wish it on [her] worst enemy."

8 also reported that GIBBS raped her.    WATERS was aware of these acts of violence directed at the Victims and was aware that these acts were used to control the Victims.

Importantly, GIBBS and WATERS maintained the Victims in isolation to eliminate their access to resources, family, and other options for obtaining drugs.    While some of the Victims saw one another during their time with the Defendants, they typically kept them living apart from one another and controlled their movements and communications with anyone besides GIBBS or WATERS.    Moreover, the properties are very rural and thus, the Victims did not feel there was anywhere they could go.    Multiple Victims explained that GIBBS and WATERS imposed and enforced rules, which included: (1) not leaving the property without permission; (2) not having visitors; (3) not using their cell phones except when working for them; (4) not using GIBBS' vehicles unless working for the Defendants; (5) following commands regarding work, e.g., boost, clean GIBBS' house, childcare, commercial sex; (6) not talking about GIBBS on dates and using code words for money, e.g., "flowers" or "roses"); and (7) not buying or obtaining drugs from other people.    While the Victims realized that their situation with GIBBS and WATERS was unfair because they were providing GIBBS and WATERS with much more money or labor than they were receiving in drugs, the strength of their addictions and related fear of withdrawal, as well as the climate of coercion and manipulation they constantly lived within, resulted in their continued labor for the Defendants.

With respect to the sex trafficking victims, GIBBS and WATERS typically provided each Victim with a flip phone or burner phone.    The respective Backpage advertisements for the Victims often contained the number of the Victim's assigned burner phone.    The Defendants instructed the Victims to use the phones only for work and required them to take the phones with

10

them into the dates.   Once inside the room, GIBBS told some of the victims to touch the customers to see if they were wearing wires, have the money laid on a table prior to the commercial sex act, and then call the Defendants after the act was completed.   The Victims were then required to hand the money over to GIBBS or WATERS, often by placing the money in the glovebox of one of the Defendants' vehicles.   According to victim testimony, WATERS managed creating and paying for the commercial sex advertisements on various platforms, which included photographing the Victims in suggestive clothing, creating and posting advertisements online, scheduling dates, and booking hotel rooms.   When credit card companies stopped processing payments for Backpage.com, the Defendants adapted by using gift cards and/or prepaid cards to purchase bitcoin, which they used to pay for the advertisements.   WATERS also oversaw making sure the Victims' hair was done and that they looked good for photographs and/or commercial sex dates.   WATERS did most of the driving to and from dates, although GIBBS occasionally drove the Victims to dates as well.   The Defendants obtained hundreds of thousands of dollars from the Victims' commercial sex work.   According to Victim 5, the Defendants set her rates for customers at $150 for half an hour and $300 for an hour.   Other Victims reported similar rates. At one point, Victim 5 began tracking the money she made on a piece of paper.   She estimated that she made $29,800 through commercial sex, all of which she handed over to the Defendants.[5] Victim 7, who stayed with the Defendants for approximately ten days in November 2015, made a little over $2,000 in just two of those days doing dates, all of which she gave to WATERS.

---

[5] She no longer has the paper, which she had hidden under her mattress while staying at GIBBS' property.

With respect to the forced labor victims, GIBBS and WATERS provided lists of items to steal and the Victims would go and steal, or "boost," the items, often from local outlet stores or home improvement stores, and would then drive the Victims to the stores.   WATERS often transported the Victims to the boosting locations and back to GIBBS' properties.   The Victims turned the items over to the Defendants, who then personally used the items or resold the items on sites like Facebook marketplace or eBay or to existing "customers."   In exchange for their labor, Defendant GIBBS gave the Victims drugs for that day.   The Defendants also required some of the Victims to panhandle or engage in manual labor on GIBBS' various properties, including cleaning, moving and burning trash, taking care of GIBBS' dogs, providing childcare for the Defendants, and doing household work.   Boosting, however, brought in the most money for the Defendants, given the expensive nature of the items that the Defendants' instructed the Victims to steal (often including power tools and electronics).   One Victim estimated that she stole approximately $100,000 worth of goods for the Defendants, and several Victims stated that Defendants drove them to stores nearly every day to boost.

This was an organized and well-executed scheme that the Defendants carried out like clockwork for years.   They took the same model employed in their early years of sex trafficking and, after Backpage was taken down by law enforcement, switched their tactics to forced labor, all the while maintaining their predatory recruitment of vulnerable victims that they could easily control.   The nature and circumstances of these offenses are grave, as indicated by the 15-year mandatory minimum sentence for each sex trafficking count and presumption of detention on 15 of the 17 counts.   This factor weighs in favor of detention.

b. <u>Weight of the Evidence</u>

As indicated by the information provided above, the weight of the evidence in this case is strong. It consists of cross-corroborative victim/witness testimony from numerous Victims of both forced labor and sex trafficking. As shown in Exhibit 1, the Victims were victimized from at least 2014 to 2020, and some do not overlap in their time at the Defendants' properties. Even for those that did overlap, many did not know each other due to the Defendants' rules. For instance, Victim 1 and Victim 2 never met, but were victimized, in part, during the same time period. Nevertheless, the Victims' accounts of GIBBS' and WATERS' coercive scheme, plan, and pattern of victimization are consistent across the board. This independent, cross-corroboration is significant.

Additional corroborative evidence includes, but is not limited to, information obtained from the Defendants' multiple e-mail addresses, Facebook communications, commercial sex advertisements, police reports pertaining to boosting, police reports pertaining to drugs and prostitution, hotel records, financial records, and cell phone records and communications. Below are just some of the specific evidentiary findings supporting this case:

- 909 commercial sex advertisements on Backpage for various women including, Victims 1 through 7, and many other women,[6] from April 2014 through November 2016.

- Records from Backpage and Google showing that WATERS used four different Gmail addresses, including her personal email address and discretionarydates@gmail.com, to post the 909 advertisements noted *supra*.

---

[6] While the government charged nine victims of sex trafficking and six victims of labor trafficking, those are just the strongest counts. Many of the women posted have never been identified. The press release regarding the Indictment and arrest garnered significant local media attention, and the government anticipates that HSI and/or the National Human Trafficking Hotline will receive calls regarding the potential victimization of additional victims. The government continues to investigate other potential other victims of both sex trafficking and forced labor.

- When GIBBS was arrested in February 2015, law enforcement found a business card for "Discretionary Dates" in his front pocket.  Moreover, upon his arrest on the instant charges, GIBBS admitted to owning "Discretionary Dates," which he described as an escort service.

- Records from Paxful, an online virtual currency marketplace, show that WATERS used a Paxful account in her name to purchase bitcoin in order to buy Backpage.com advertisements.

- Law enforcement obtained various text messages from GIBBS to Victims that discuss dates, money, and not giving out drugs until dates were complete.  The below text exchange between GIBBS, Victim 4, and WATERS on January 10, 2016, is one example.

  > *Gibbs*: Aint givn nutn til my dates r dun. Im kumin bak rite now
  > *Victim 4*: Im scapn my bgs cuz im hurt
  > *Gibbs*: Im tired a u tryna kontrol me wit dz dates. … Aint givn no more dope b4 dates eva agn"; …Aint givn nutn till my dates r dun. … If dis nite dnt make me my muny bak aint givn nobdy shyt 2mar… Dnt ask 4 more b4 dis date.

  > *Waters*: hour appt at at hampton inn in salisbury after this one. Waiting on address and room number now.

- Law enforcement also obtained text messages from GIBBS to Victims about boosting and withholding drugs.  For example, GIBBS and Victim 11 exchanged the texts below over a series of months in 2018:

  > *Gibbs:* Electronics r always the preference. . . Also if u kan find a hi tech wireles security system.  Get da stuf and jam it n da kar. Shyt u shud use da truk wit a fake tag.

  > *Victim 11*: Im sick as hell can you please help me so i can work I been laying here in pain sense like 1 this mornin.  We can def sell the stuff I got

  > After stealing a piece of construction equipment which was then spray painted and recovered by Delaware State Police near the Dusty Road property:

  > *Victim 11*: it's moved.  what's up? Spray painting

14

- During the premises search, law enforcement found a handwritten signed contract between WATERS and Victim 12 dated June 2020.  The contract, which appears to be written in WATERS' handwriting, refers to Victim 12 as the "tenant" and states that the tenant agrees that she will use the transportation provided by WATERS, specifying further that WATERS will transport Victim 12 to/from Lowes (a common location for boosting) any time before midnight; that, at no time, will the tenant be picked up or dropped off on Jimtown Road; and that no stolen goods should be brought back to the house (a fact belied by multiple victim/witness statements).   The contract indicates that, if the tenant does not comply, the tenant will be evicted "on the spot."

- When WATERS was arrested on the instant charges, law enforcement found Victim 12's driver's license inside WATERS' purse.

- In July 2020, local law enforcement arrested Victims 9 and 12 after they attempted to steal from Acme Grocery store and drove away in a vehicle registered to WATERS.   Law enforcement found the vehicle at GIBBS' home immediately after the attempted theft.

- Local law enforcement arrested WATERS and a potential victim at the Walmart in Georgetown, DE, for boosting.   WATERS brought the police officers to a Suburban, registered to GIBBS, where law enforcement found approximately $2,000 worth of boosted items inside.

- Law enforcement uncovered text messages from the Defendants regarding boosting.   For example, WATERS sent the text messages below to Victim 13 on April 11, 2020:

  > *Waters*: Idk how comfy u are with walmart but me and Minor 1[7] need some things from there…I've gotten a few things...going thru self checkout... I'll send u short list. … Get things on the lists I write AND things that we can sell...get a generator, a miter saw, lawn mower...gas power not electric.

  > *Waters*: If u plan on getting something like the stuff I mentioned...come to him, humble yourself to him...tell him yup I've not lived up to potential but I can't be sick no more either and my tolerance has been lower since I've been sick so I need car to go get such n such…

- On one occasion in 2014, WATERS was arrested outside of a hotel with Victim 3's social security card in her purse – outside of Victim 3's presence because Victim 3 was in the hotel doing a commercial sex date.

---

[7] Minor 1 is GIBBS' daughter, whom WATERS helped raise.

- In the spring of 2022, law enforcement obtained a warrant to search two phones associated with GIBBS.

    - The phones showed chats dating back to fall 2020 between GIBBS and Victim 12 and GIBBS and WATERS. The chats corroborate Victim 12's account of her time living at GIBBS' 32287 Jimtown Road property.

    - The phones also contained screenshots from August 2020 where WATERS provided GIBBS with the names, dates of birth, and Social Security Numbers for two men. For each man, WATERS noted "no monthly income" and for one man she noted "under table work."

- During the premises search, agents found a handwritten note indicating an agreement between Victim 11 and WATERS. The note stated that Victim 11 would sell his vehicle to WATERS for an unspecified price. Victim 11 separately identified this vehicle as being the one he sold to the Defendants in a photo taken by Sussex County Constable's during a code inspection at the Dusty Road property.[8]

- HSI agents seized approximately 350 condoms from the Defendants' properties after the search warrant was executed on May 10, 2023. The expiration date on the boxes of condoms is 2024:



- During the premises search, HSI also seized a handwritten note containing references to the general topic of pimping, including "Ten Pimp Commandments," "Portrait of a Pimp," and "Gangster Paradise." During his interview with HSI agents, GIBBS denied any knowledge of pimping or of

---

[8] According to Victim 11's statements, soon after meeting GIBBS, Victim 11 "sold" his vehicle to the Defendants in exchange for small amounts of heroin and crack cocaine.

researching or owning any materials or books on pimping.[9]   There was also a note, in the same handwriting, that said, "Why laws about prostitution are illegal . . . system discrimination."   In addition, GIBBS has an e-mail address at pusepedlrbynachr@aol.com, or, as sounded out, "pussy peddler by nature."[10] When asked about this email address on May 10, 2023, GIBBS commented that the agent was going way back.

- Agents seized another handwritten note, in the same handwriting, that said, "Victims of harsh circumstances."   A fourth note, this one in different handwriting,[11] said "Advertise where dope teens be getting help."   Based on the totality of circumstances in this case, it is likely that these notes are consistent with GIBBS' and WATERS' strategy of recruiting vulnerable and drug-addicted victims to exploit by way of forced labor or commercial sex.

- Agents seized another handwritten note which says, "how many times did you go on dates and no sex."   Above that line is written the word, "prohibition."

While law enforcement did not find any evidence of drugs on the properties during execution of the search warrant, the above-outlined evidence alone, including the victim testimony summarized herein, is enough to demonstrate the significant weight of the evidence against Defendants.   Every Victim will testify that GIBBS and/or WATERS provided them with drugs. The weight of the evidence overall weighs heavily in favor of detention.

---

[9] Victim 8's testimony will corroborate these handwritten notes and their import.   She told law enforcement that GIBBS had her watch a documentary on pimping because he told her he wanted her to be his new "bottom girl" and be in charge of the other women.   Victim 7 also reported hearing GIBBS listening to, or watching, pimping audio and video recordings.

[10] A review of WATERS' personal email address showed that she sent and received emails to/from that account addressed to "Homie Luver Friend" and "King of My Castle," presumed to be GIBBS. In one such e-mail, WATERS provided "Homie Luver Friend" with information for all bills he would need to know how to pay if she was gone for a month, which included utility accounts for GIBBS' properties held in the name of WATERS' minor daughter.

[11] The font on the first three notes was sloppier and choppier and more consistent with a male's handwriting.   The font on the last note was neater and more consistent with a female's writing.

c. History and Characteristics of the Defendant

WATERS' criminal history includes state convictions for drug possession and theft. These convictions occurred during and around the time period of the alleged offense conduct and reflect aspects of the multi-faceted coercive scheme in which the Defendants engaged.

As reflected above by the corroborative evidence, *see* Section II(b), *supra*, whether it be managing the commercial sex operation – including photographing and posting Victims online, preparing Victims for dates, scheduling, booking hotel rooms, and driving Victims to dates – or giving them lists of items to boost, WATERS was a direct and active participant in these criminal endeavors. She also demonstrated a lack of respect for the law, evidenced by the fact that she continued this conduct *after* law enforcement intervention (i.e., after her arrest in 2015) and after learning of this federal investigation. WATERS' internet search history shows that she googled "federal human trafficking investigation" on May 25, 2016.

Additionally, in April 2022, GIBBS submitted an application for $33,000 in funding from the Sussex County Housing Trust Fund. In the application, GIBBS claimed he was the president of the non-profit organization "Help Our People Elevate" or "HOPE," which he claimed was operated from 32295 Jimtown Road in Lewes – the property adjacent to his residence and one of the properties where Victims resided and worked. On the application, GIBBS stated that HOPE will "develop multifamily units for affordable rentals to those @ 80% or below AMI (area median income). Housing units will be marketed to area organizations serving targeted families." During the execution of the search warrant on May 10, 2023, law enforcement found various documents pertaining to HOPE, including handwritten notes (which appear to be in WATERS' handwriting) about prospective people staying at the property through the non-profit.

18

Additionally, during his post-arrest interview, GIBBS said that, under the auspices of HOPE, some unidentified individuals had recently been living at his properties located at 32295 Jimtown Road and Dusty Road.    Based on the totality of the investigation, there is reason to believe GIBBS was planning to recruit vulnerable individuals through HOPE[12] and exploit them in ways similar to his exploitation of the Victims, and that WATERS was doing significant legwork to bring this endeavor to fruition.

While WATERS' criminal history does not include assaultive offenses, it does contain theft and drug-related offenses consistent with aspects of the Defendants' coercive scheme. Moreover, her continued engagement with GIBBS and continued criminal conduct after law enforcement intervention is concerning and further supports that detention is merited in this case.

### d.   Danger to the Community if the Defendant is Released

The United States anticipates the defense will insist to the Court that the Defendant cannot pose that much of a danger given the gap in time between the alleged offense conduct and her arrest.    Simply put, if the Defendant was such a danger to the community, and the government knew about it since 2015, why did they leave her out in the community until now?    The government first addressed this point in Section I, *supra*, and reemphasizes here that the Defendants chose the coercive scheme utilized in this case: preying upon vulnerable victims with

---

[12] GIBBS owns another purportedly legitimate business called CG Hauling, which is held out to be a business engaging in demolition, transportation of mobile homes, and commercial and residential cleanup.    The government obtained various records wherein GIBBS reported information about CG Hauling.    In December 2022, GIBBS claimed to be the manager of CG Hauling for 35 years and claimed an income of $3,600.    In various other applications throughout 2022, he reported no income, an income of $2,800, and an income of $38,000.    On his 2014 tax returns, found during execution of a search warrant on WATERS' phone, GIBBS reported an annual income of $4,964 from CG Hauling.    This information supports the theory that GIBBS was making his living from his sex trafficking and forced labor scheme.

preexisting drug addictions.   It would go against the letter and spirit of Section 1591 to allow the Defendant to benefit from the amount of time it took to bring charges, where that time period is premised on the relapses, and two overdose deaths, of the drug-addicted people whom they chose to victimize.   *See United States v. Fields*, 2013 WL 11318863, at *3 (M.D. Fla. Dec. 11, 2013) (in upholding § 1591 conviction, defendant "cannot defeat his prosecution through the very traits of his victims that he sought to exploit [*e.g.*, drug addiction], because those traits comprised the victims' 'backgrounds' and 'circumstances' in evaluating the seriousness of Defendant's threatened harm" of drug withdrawal.)

Furthermore, the United States cannot bring charges against an individual without sufficient evidence for the case to stand, regardless of knowing that criminal activity is occurring. The continuous criminal conduct charged in the Indictment went on from 2014 to 2020, and the United States rightfully bears the burden to prove the conduct beyond a reasonable doubt.   To that end, the United States has carefully corroborated that criminal conduct, an endeavor which has taken time.   For instance, as described in Sections I and III, the government has gathered extensive corroborative evidence.   GIBBS' Facebook account alone was 88,599 pages and took substantial time to thoroughly review.   For the reasons discussed herein, due to the intentional nature of the Defendants' coercion scheme, significant evidentiary and investigative obstacles slowed the government at every step.   It is not that the government did not believe the Defendant posed a danger to the community; it is that the government was not confident it could prove it. Until now.

Over the course of the investigation, the United States learned that the Defendants threatened numerous victims and witnesses with harm befalling them or their families should they

leave the Defendants or cooperate with law enforcement.   For instance, one Victim relayed that after she fled the Defendants' property, GIBBS physically assaulted her when he later encountered her in public.   This incident occurred *after* GIBBS had previously sent three women to beat the Victim up in retaliation for stealing drugs when the Victim escaped from his property.   After the deceased victim (discussed *supra*) left the Defendants, WATERS posted a Backpage advertisement with her bwaters420@gmail.com address in which she called the deceased victim a thief who was "very well known to steal everything you have."   GIBBS told another Victim that he would "make [the Victim] disappear" if the Victim spoke to the police.   Another Victim heard through community-members that GIBBS wanted to "put a bullet in [the victim's] head" because he thought she had "snitched."   Additionally, Defendants told several Victims that members of GIBBS' family – many of whom also reside in or near Sussex County – might bring harm to the Victims if they cooperated with law enforcement.   Among other reasons, the Victims found – and find – these threats credible because many of them met the Defendants through members of GIBBS' family and know that some of the family members carry or have access to firearms.   As articulated in the basis for the Stipulated Protective Order granted on May 12, 2023, there is a legitimate safety concern to the Victims and witnesses in this case.

Further, as discussed above in Section III(c), Defendants continued their scheme even after awareness of law enforcement intervention; GIBBS and WATERS have known that HSI is investigating them for federal human trafficking offenses since their arrest/interviews in 2015. That did not stop them.   And now that charges have been brought, and the Defendant faces guidelines of what could be considered a life sentence,[13]  she has reasonable incentive to attempt

---

[13] The guidelines range for Counts 1-9 is extremely high without even considering criminal history

to dismantle this case, which starts with persuading Victims and witnesses not to participate, or possibly destroying evidence.[14]

### e. Why Any Proposed Conditions Are Not Sufficient

The question the Court must consider is whether there is any possible combination of conditions that can reasonably assure the Defendant's appearance at court and the safety of the community. There is not. Even the strictest form of location monitoring – home incarceration – does nothing to assure the Court of the safety of the community. The Defendants focused their scheme around bringing Victims to GIBBS' properties, which are in an isolated and rural area, and using cell phones and the Internet to set-up commercial sex acts and resell boosted items. As such, home incarceration does not prevent the Defendant from continuing to exploit men and women. WATERS was an integral part of the operation and thus can continue to run it at the request of GIBBS if she is on release. This concern is bolstered by the fact that WATERS has not had a steady job since 2012. Nor does home incarceration prevent WATERS from trying to dissuade Victims to participate in the investigation – either at her own or GIBBS' behest. And

---

points: The base offense level for sex trafficking is **34** under U.S.S.G. § 2G1.1(a)(1). The +5 enhancement under §§ 2G1.1(d)(1) and 3D1.4 applies since the Defendants compelled more than five victims to engage in commercial sex. Those two factors alone result in an offense level of **39**, and that is without even considering other enhancements such as vulnerable victim. Offense level 39, assuming a criminal history category of I, results in a guidelines range of 262-327 months, or 21-27 years.

[14] In October 2014, WATERS was arrested twice for drug paraphernalia in less than two weeks. After the arrests, Victim 4 witnessed GIBBS grab logs of heroin from a trailer at the Dusty Road property and place them into a trash bag, telling her that he was going to get rid of them in case the police came to his home. Additionally, Victim 13 and her husband both described moving into the house on 32295 Jimtown Road in early 2020 and recalled discovering around 30 burner phones in the house. They examined the phones and saw sexual images of women on the phones, including photos of women that Victim 13 recognized from around Sussex County. When they mentioned the phones to GIBBS, he told them to dispose of the phones and Victim 13's husband put the phones in the trash.

while pre-trial detention likewise does not guarantee WATERS will not engage in witness intimidation or further harm, it will allow the government to monitor WATERS' conduct and make efforts to ensure that the Victims and witnesses are not intimidated or endangered.

Accordingly, the government submits there is no combination of conditions that would reasonably assure the safety of the community, and particularly the safety of the Victims and witnesses involved in this case, if WATERS is released.

## IV.    Conclusion

WATERS has been charged with nine counts of sex trafficking, each carrying a mandatory minimum 15 years of imprisonment, and six counts of forced labor.   Each of those counts carries a presumption of detention.   While the investigation was lengthy, that fact does not obviate the need for detention, nor alleviate the serious and specific concerns outlined herein.   The Defendants chose the Victims precisely because of their vulnerabilities.   Due to the Defendants' tactics, it took the United States years of herculean efforts by law enforcement agents, victim witness advocates, and prosecutors to compile enough evidence and enough stable and cooperative victims to bring a case against the Defendants.   In this case, justice delayed is not justice denied; the Defendant should not benefit from the delay that her and GIBBS' coercive tactics, in part, caused.   Moreover, the Defendant's conduct even after she became aware of the government's investigation should give this Court pause as to whether she will meaningfully or fully comply with any conditions the Court would set.

For all the foregoing reasons, the United States respectfully recommends the Defendant be detained.

Respectfully submitted,

DAVID C. WEISS
UNITED STATES ATTORNEY

BY: */s/ Briana Knox*
    Briana Knox
    Assistant United States Attorney

*/s/ Rebekah J. Bailey*
REBEKAH J. BAILEY
Trial Attorney
U.S. Department of Justice
Civil Rights Division, Criminal Section
Human Trafficking Prosecution Unit

*/s/ Caylee E. Campbell*
CAYLEE E. CAMPBELL
Trial Attorney
U.S. Department of Justice, Criminal Division
Money Laundering & Asset Recovery Section

**EXHIBIT 1**
**SUMMARY CHART**
**US v. Gibbs, et al.**

| Count | Charge | Timeframe |
|---|---|---|
| | **SEX TRAFFICKING** | |
| 1. | 18 U.S.C. § 1591 Sex Trafficking – Victim 1 | Apr 2014 – Mar 2015 |
| 2. | 18 U.S.C. § 1591 Sex Trafficking – Victim 2 | June 2014 |
| 3. | 18 U.S.C. § 1591 Sex Trafficking – Victim 3 | June 2014 – Oct 2014 |
| 4. | 18 U.S.C. § 1591 Sex Trafficking – Victim 4 | Aug 2014 – Jan 2016 |
| 5. | 18 U.S.C. § 1591 Sex Trafficking –  Victim 5 | Jan 2015 – Feb 2015 |
| 6. | 18 U.S.C. § 1591 Sex Trafficking – Victim 6 | Feb 2015 |
| 7. | 18 U.S.C. § 1591 Sex Trafficking – Victim 7 | Nov 2015 |
| 8. | 18 U.S.C. § 1591 Sex Trafficking – Victim 8 | July 2016 – June 2018 |
| 9. | 18 U.S.C. § 1591 Sex Trafficking – Victim 9 | May 2020 – Dec 2020 |
| | **FORCED LABOR** | |
| 10. | 18 U.S.C. § 1589 Forced Labor – Victim 8 | July 2016 – June 2018 |
| 11. | 18 U.S.C. § 1589 Forced Labor – Victim 10 | Oct 2016 – Dec 2019 |
| 12. | 18 U.S.C. § 1589 Forced Labor – Victim 11 | Jan 2018 – Sept 2018 |
| 13. | 18 U.S.C. § 1589 Forced Labor – Victim 12 | Apr 2018 – Dec 2020 |
| 14. | 18 U.S.C. § 1589 Forced Labor –Victim 13 | Jan 2020 – April 2020 |
| 15. | 18 U.S.C. § 1589 Forced Labor – Victim 9 | May 2020 – Dec 2020 |
| | **MANN ACT** | |
| 16. | Mann Act – Victims 5 & 6<br>18 U.S.C. § 2421 | Feb 2015 |
| 17. | Mann Act – Victim 4<br>18 U.S.C. § 2421 | Jan 2016 |