**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 23-35-CFC-1 |
| | ) | |
| CLIFTON GIBBS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

A jury found Defendant Clifton Gibbs guilty of seven counts of sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. §§ 1591, 1594, and 2 (Counts I, II, and IV–IX of the Indictment); five counts of forced labor in violation of 18 U.S.C. §§ 1589, 1594, and 2 (Counts X–XV); and one count of interstate transportation for the purposes of prostitution in violation of 18 U.S.C. § 2421 (Count XVII). (The government dismissed Counts III, VII, XIV, and XVI before trial.) Pending before me is Gibbs's motion for a new trial and for a judgment of acquittal. D.I. 276. Gibbs proceeds pro se, having accused the lawyer who represented him at trial of withholding documents from him and having told the Court that he was "unable to find the means to get [her] to allow [Gibbs] to assist in [his] own defense" in violation of the Sixth Amendment. D.I. 251 at 1; August 6, 2025 Oral Order.

I.

I begin with Gibbs's request for a judgment of acquittal. Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

At the conclusion of the government's case-in-chief at trial, Gibbs's counsel moved for a judgment of acquittal on all counts under Rule 29. I denied the motion with respect to Counts II, IV, VI, VIII, and IX and reserved decision with respect to the remaining counts. Gibbs has not asked me to reconsider, and therefore I am not revisiting, my decision to deny his Rule 29 motion with respect to Counts II, IV, VI, VIII, and IX.

I turn then to assess whether the government adduced at trial evidence sufficient to sustain Gibbs's convictions of Counts I, V, X, XI, XII, XIII, XV, and XVII. In making that determination, I must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence" and "draw all reasonable inferences in favor of the jury's verdict." *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (internal quotation marks and citations omitted). And I "must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and

assigning weight to the evidence, or by substituting [my] judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted).

A.

Counts I and V charged Gibbs with sex trafficking by force, fraud, or coercion in violation of §§ 1591(a)(1), 1594(a), and 2. D.I. 3 at 1. Section 1591(a)(1) defines the sex trafficking offense. Section 1594(a) makes it a crime to attempt to violate certain federal criminal statutes, including § 1591(a)(1). 18 U.S.C. § 1594(a). And § 2 makes it a crime to aid and abet the commission of any federal criminal law. 18 U.S.C. § 2.

As relevant here, § 1591(a)(1) makes it a crime to

> knowingly . . . in or affecting interstate . . . commerce . . . recruit[], entice[], harbor[], transport[], provide[], obtain[], [or] maintain[] . . . by any means a person . . . knowing . . . or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act . . . .

18 U.S.C. § 1591(a)(1).

Thus, to obtain a conviction under § 1591(a)(1) as pleaded by the government here, the government had to prove that (1) the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) he did so knowingly or in reckless disregard of the fact that

means of force, fraud, or coercion, or any combination of such means, would be used to cause that person to engage in a commercial sex act; and (3) his acts were in or affecting interstate commerce. *See United States v. Williams*, 666 F. App'x 186, 196–98 (3d Cir. 2016) (outlining elements).

Section 1591(e)(2) defines "coercion" to mean:

> (A) threats of serious harm to or physical restraint against any person;
>
> (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
>
> (C) the abuse or threatened abuse of law or the legal process.

18 U.S.C. § 1591(e)(2). And § 1591(e)(5) defines "serious harm" to mean

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

18 U.S.C. § 1591(e)(5).

1.

Marissa was the alleged victim in Count I. The government relied principally on her testimony and the testimony of Brooke Waters to prove Count I. *See* D.I. 290 at 6; D.I. 291-1 at 1–4.

Waters testified that she and Gibbs became paramours in 2010, that she moved in with Gibbs on his rural property in Lewes, Delaware, sometime in 2012, that she helped Gibbs sell drugs between 2012 and 2014, and that she and Gibbs started an escort service beginning in April 2014. D.I. 253 at 96, 98, 102, 133. According to Waters, Marissa was the first woman that Waters and Gibbs "ended up arranging commercial sex dates for." D.I. 253 at 137. Waters testified that Marissa lived on Gibbs's property for a two-to-three month period in 2014. D.I. 253 at 139. Waters described at trial how, at Gibbs's direction during that period, Waters purchased dresses, high-heeled shoes, and lingerie for Marissa; photographed Marissa in that clothing; posted the photographs on a commercial sex webpage Waters had set up; and arranged for Marissa to have a cell phone to field calls from men interested in having sex with Marissa. D.I. 253 at 127–38. Waters testified that she and Gibbs drove Marissa to hotels in Delaware and Maryland where Marissa engaged in commercial sex acts, and that Gibbs took possession of the money Marissa obtained from these sexual encounters. D.I. 137–139.

According to Waters, Gibbs started dealing heroin "around the time Marissa got there" and he provided Marissa drugs "throughout the time that Marissa was at [his] property." D.I. 253 at 140. The government adduced at trial the following testimony from Waters about Gibbs's provision of heroin to Marissa:

Q. How much would she get on a given occasion, if you know?

A. I'm not 100 percent sure. Maybe like six to eight bags of heroin all the way up to a 13, which was a bun.

Q. When would [Gibbs] give her drugs?

A. He would give them to her after the date was done. If she was going through what we call dope sickness,[1] he would give her a couple to get her through the date and then give her the rest when she got back.

Q. Did you ever see Marissa dope sick when she was at the property?

A. Yes. I saw her experience the beginning signs of dope sick.

Q. When was that?

A. I don't know a particular time. It happened often enough, especially when you wake.

Q. Was there a specific time of day?

A. When you wake up in the morning, yes.

---

[1] According to the government's expert, Dr. Denis Antoine, "dope sickness" or "withdrawal" occurs when a drug addict's body has become dependent on the drug but no longer has access to it. D.I. 255 at 53. He also testified that symptoms of dope sickness include physical symptoms, such as diarrhea, sweating, difficulty keeping food down, and diminished eye function, and psychological symptoms, such as difficulty concentrating, behavior issues, and memory loss. D.I. 255 at 53–54. Dr. Antoine's testimony is consistent with the alleged victims' testimony when describing their dope sickness symptoms. *See, e.g.*, D.I. 256 at 6 (Marissa); D.I. 257 at 6–7 (Shae); D.I. 258 at 5–6 (Candice). The dope sickness that all the alleged victims testified they suffered from meets the definition of "serious harm" under § 1591(e)(5).

> Q. And when Marissa woke up in the morning, she would be experiencing the -- or you would observe the initial onset of dope sickness?
>
> A. Yes.
>
> Q. Would the defendant give her drugs in the morning?
>
> A. Yes.

D.I. 253 at 141–42.

Waters testified that Marissa left Gibbs's property after about "two, three months" and returned "[m]aybe a couple weeks later." D.I. 253 at 139, 143. Waters said that Marissa returned "[b]ecause she needed drugs." D.I. 253 at 143. According to Waters, Marissa "couldn't find drugs anywhere else and knew [Gibbs] had them." D.I. 253 at 144. Waters testified that Marissa "would call [Gibbs] up [and] ask to come back" and Gibbs responded that for her to come back and "get the drugs," Marissa had to "go on dates." D.I. 253 at 144. Waters said that after Marissa returned to the property Waters again posted Marissa on the commercial sex webpage Waters had previously created and that Marissa left the property for good about a month later. D.I. 253 at 144–45.

Marissa testified at trial that she was a homeless heroin addict when she went one evening to the home of Gibbs's son. D.I. 256 at 9–10. Marissa was looking to buy heroin. Gibbs's son told her "he didn't have any on him at the time" but could get it from "a guy" he knew who "would be over in the morning."

D.I. 256 at 10. Marissa spent the night at the house. D.I. 256 at 10. The next morning, Gibbs showed up. D.I. 256 at 10–11. "Almost right away" upon meeting Marissa, Gibbs asked her what kind of drugs she used and asked her to stand up so he could "take a look at [her] and just like check [her] out." D.I. 256 at 13. Gibbs then drove Marissa to a trailer where he gave her heroin for free. D.I. 256 at 14–16. After Marissa used the heroin, Gibbs drove her to his property in Lewes and allowed her to stay there in a brand-new camper, which, in Marissa's eyes, looked like "a palace." D.I. 256 at 17–18. Marissa met Brooke Waters that day. D.I. 256 at 18. And consistent with Waters's trial testimony, Marissa testified that Waters gave her heroin; took her shopping for lingerie, clothes, food, and a disposable cell phone; and photographed her in the lingerie and worked with Gibbs to post the photographs on a commercial sex webpage. D.I. 256 at 18–23. Marissa also testified that Gibbs and Waters would drive her to sex dates at hotels in Delaware and Maryland; that she gave to Gibbs and Waters the money she received from her "dates" for sex; and that "[a]fter [she] finished a date, [she] would probably just go back to the camper, and either [Gibbs] or [Waters] would give [her] some heroin for doing the date." D.I. 256 at 23–27. When asked "what would happen if you didn't get those drugs," Marissa replied, "I would be sick. I would go through withdrawal." D.I. 256 at 27.

Viewing Marissa's and Waters's testimony in the light most favorable to the government and drawing all reasonable inferences from that testimony in favor of the jury's verdict, the testimony provided a sufficient basis for a rational juror to conclude that Gibbs himself or by aiding and abetting Waters knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained Marissa and committed acts in or affecting commerce (i.e., setting up a webpage and posting on an internet site and driving Marissa to Maryland for sex acts). Thus, the testimony provided a basis for the jury to find that the government established the first and third elements of the sex trafficking offense charged in Count I. The testimony also established that Gibbs and Waters acted as Marissa's pimps and that they enticed her to engage in sex acts with the lure of heroin (and means of avoiding dope sickness) and paid her for engaging in sex acts in the form of heroin, clothes, and lodging. Although those actions do not constitute force or fraud, they do meet the definition of coercion under § 1951(e)(2) as they were part of a scheme, plan, and pattern intended to cause Marissa to believe that her failure to engage in sex dates would result in Gibbs's withholding of heroin, thereby causing her to suffer the substantial harm of dope sickness. Thus, there was record evidence from which a rational jury could find that Gibbs committed the offense charged in Count I.

2.

Shae was the alleged victim in Count V. She testified that she met Gibbs in late 2014 or early 2015 through a person named Heather, whom she had met while checked in to a drug addiction clinic in Dover, Delaware. D.I. 257 at 11–12. Shae was addicted to heroin and was suffering at the time from dope sickness. D.I. 257 at 7–11. Shae had confided in Heather that she was in dire economic straits, was being evicted from her home, and needed to find a job. D.I. 257 at 15–16. Heather responded that she knew somebody who might be able to help with Shae's money situation. D.I. 257 at 16. A few days after Shae checked out of the clinic, Heather brought Gibbs to the trailer where Shae lived. D.I. 257 at 18. "Heather stepped out of the car" driven by Gibbs and Shae "got in." D.I. 257 at 19. Gibbs asked Shae if she was still looking for work. D.I. 257 at 19. When Shae said yes, he gave her a bundle of heroin and told her he could help with her money situation. D.I. 257 at 19. Two days later, Gibbs returned to Shae's trailer. D.I. 257 at 26. Shae got in Gibbs's car, and he drove her to the Red Mill Inn in Lewes, where they checked into a room, and Gibbs handed Shae a bundle of heroin and needles. D.I. 257 at 27–28. After about fifteen minutes, Gibbs left Shae in the room. D.I. 257 at 28. Shae remained in the room and used the heroin Gibbs had given her. D.I. 257 at 28–29.

According to Shae, the next day, Heather brought a man to the room and told Shae she was to have sex with the man. D.I. 257 at 29. Heather left the room, and even though Shae did not want to have sex with the man she did so because she "didn't feel like [she] had much of a choice." D.I. 257 at 30–31. After the sex date, the man put a sum of money on a nightstand and left the room. D.I. 257 at 30. Soon thereafter Gibbs came to the room, took the money, and gave Shae some heroin and cocaine. D.I. 257 at 31. Shae testified that this pattern continued over the next couple of days: a man would come to the hotel and pay Shae money; Shae would engage in sex with the man; the man would depart; and Gibbs would arrive, take the money, and give Shae drugs. D.I. 257 at 32–34.

After a few days, Gibbs took Shae to his property in Lewes. D.I. 257 at 34. Shae lived in Gibbs's home, along with Waters. D.I. 257 at 37. Shae continued to engage in commercial sex acts that were arranged by Waters and Gibbs. D.I. 257 at 40. Waters would help Shae get ready for the sex dates and drive her to the house or hotel where the dates took place. D.I. 257 at 40. Gibbs would take the money paid to Shae for the sex acts and give Shae drugs "after the fact." D.I. 257 at 40. Gibbs gave Shae "[j]ust enough [drugs] to keep [her] going." D.I. 257 at 43. Text message exchanges between Gibbs and Shae introduced into evidence corroborated that Gibbs was aware of and took advantage of Shae's addiction by threatening to withhold drugs from her. *See* D.I. 257 at 77–81; Gov't Ex. 44.

Waters's testimony at trial corroborated Shae's testimony. *See* D.I. 253 at 168–73. Waters also testified that at Gibbs's direction she posted photographs of Shae on a commercial sex webpage, D.I. 253 at 167; Gov't Ex. 57, and arranged for Shae to have sex dates in motels in Maryland, D.I. 253 at 169.

Viewing Shae's and Water's testimony and Gov't Exs. 44 and 57 in the light most favorable to the government and drawing all reasonable inferences from that evidence in favor of the jury's verdict, this evidence provided a sufficient basis for a rational juror to conclude that Gibbs himself or by aiding and abetting Waters knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained Shae and committed acts in or affecting commerce (i.e., setting up a webpage and posting on an internet site and arranging commercial sex acts in Maryland). Thus, the testimony provided a basis for the jury to find that the government established the first and third elements of the sex trafficking offense charged in Count V. The testimony also established that Gibbs and Waters acted as Shae's pimps and that they enticed her to engage in sex acts with the lure of heroin (and means of avoiding dope sickness) and paid her for engaging in sex acts in the form of heroin, clothes, and lodging. Although those actions do not constitute force or fraud, they do meet the definition of coercion under § 1951(e)(2) as they were part of a scheme, plan, and pattern intended to cause Shae to believe that her failure to engage in sex dates would result in Gibbs's

withholding of heroin, thereby causing her to suffer the substantial harm of dope sickness. Thus, there was record evidence from which a rational jury could find that Gibbs committed the offense charged in Count V.

B.

In each of Counts X, XI, XII, and XIII, the Indictment charged Gibbs and Waters with "together and aiding and abetting each other, . . . knowingly provid[ing] and obtain[ing] the labor and services of [an individual victim] . . . by: (a) threats of serious harm to [that victim]; and (b) means of a scheme, plan, and pattern intended to cause [that victim] to believe that, if [the victim] did not perform such labor or services, that [victim], or another person, would suffer serious harm; and attempt[ing] to do so, in violation of Title 18, United States Code, Sections 1589[(a)(2) and (4)], 1594(a), and 2." D.I. 3 at 6–9. For each of the counts, the government was required to prove that (1) Gibbs provided or obtain the labor or services of the person named in the count in question of the Indictment; and (2) Gibbs did so by one or both of the following means: (a) threats of serious harm to the person named in the count of the Indictment; or (b) a scheme, plan or pattern intended to cause that person to believe that if that person did not perform such labor or services, that person or another person would suffer

serious harm. 18 U.S.C. § 1589(a)(2) and (4). "Serious harm" for purposes of § 1589(a)(2) and (4) is defined as

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).[2]

1.

Samantha was the alleged victim in Count X. She testified that she was a heroin addict and cocaine user when she met Gibbs in an area known for drug dealing and commercial sex. D.I. 262 at 11–15. During their first meeting, Gibbs specifically asked Samantha what drugs she used and how she paid for them. D.I. 262 at 14–15. Samantha told Gibbs that she used heroin and cocaine and that she "boosted" (i.e., shop lifted) and engaged in commercial sex. D.I. 262 at 15. Gibbs drove Samantha to his property where he gave her cocaine and had her engage in sex with a man. D.I. 262 at 14–18.

[2] This definition of "serious harm" is identical in all material respects to the definition of "serious harm" in § 1591(e)(5). And thus, here again, the dope sickness that all the alleged victims testified they suffered from meets this definition.

A few weeks later, Samatha returned to Gibbs's property. D.I. 262 at 20. She shared with Gibbs that she was dope sick at the time. D.I. 262 at 21. Gibbs gave Samantha "a little" of both cocaine and heroin, and they talked about Samantha boosting in return for drugs. D.I. 262 at 22. Gibbs told Samantha that in order for her not to be sick, she would have to boost or engage in commercial sex dates. D.I. 262 at 21.

Samatha stayed in a camper on the property. D.I. 262 at 23. Over the ensuing month or so, Gibbs would give Samantha some heroin in the morning, Samantha would boost goods from nearby outlets for Gibbs, and afterwards Gibbs would give Samantha heroin and cocaine. D.I. 262 at 24–29, 41, 49–50. Gibbs tied the amount of drugs he would give Samantha in the evening to the amount and value of the goods she boosted. D.I. 262 at 50–51.

Viewing Samantha's testimony in the light most favorable to the government and drawing all reasonable inferences from her testimony in favor of the jury's verdict, a rational juror could conclude from her testimony that Gibbs obtained from Samantha labor and services in the form of boosting by a pattern of behavior intended to cause Samantha to believe that if she did not boost for Gibbs she would suffer from dope sickness. Accordingly there was a sufficient evidentiary basis for the jury to find Gibbs guilty of Count X.

2.

Candice was the alleged victim in Count XI. Candice testified that she met Gibbs at a known drug area in Delaware called Crabapple Lane. D.I. 258 at 6. Candice was a heroin addict who suffered from dope sickness when she could not obtain the drug. D.I. 258 at 5–6. According to Candice, she got into Gibbs's car, and he asked her, "What's your poison?" D.I. 258 at 7. Candice replied, heroin and crack cocaine. D.I. 258 at 7. Gibbs said, "I can work with that." D.I. 258 at 8. Gibbs asked Candice if she was hungry. D.I. 258 at 8. She said she was, and Gibbs took her to a nearby store and got her something to eat. D.I. 258 at 8. He also asked her if she had a phone, and learning that she did, he bought her a phone card at the store. D.I. 258 at 8.

Candice eventually agreed to move into Gibbs's property. D.I. 258 at 13. She agreed to do so because she was "couch surfing from this house to that house," "sleeping outside," not eating, and she "thought maybe that [Gibbs's] promises were probably real of having a roof over my head and food, and just basically kind of whatever [she] needed." D.I. 258 at 13. While she lived on the property, Candice performed a variety of jobs for Gibbs, including feeding his five dogs, cleaning up his yard and residence, helping demolish a house, and sorting and transporting materials to a junk yard. D.I. 258 at 17–19. She also boosted for him on occasion. D.I. 258 at 25. Candice did not want to perform these tasks, but she

did so because she "wanted the drugs at the end of the day." D.I. 258 at 22. Each day, Gibbs would give Candice heroin and cocaine in the morning and then, after she had completed a long day of work, would give her heroin or cocaine at night. Gibbs would give her enough heroin in the morning so that she would not be dope sick. D.I. 258 at 19–21. He would not give her heroin during the day when she asked for it because she "had [work] to do" and "he couldn't afford to have [her] high when [she] was trying to work." D.I. 258 at 21.

Viewing Candice's testimony in the light most favorable to the government and drawing all reasonable inferences from her testimony in favor of the jury's verdict, a rational juror could conclude from this testimony that Gibbs obtained from Candice labor and services in the form of feeding his dogs, cleaning up his yard and residence, demolishing his house, sorting and transporting materials to a junk yard, and boosting by a pattern of behavior intended to cause Candice to believe that if she did not perform this labor and services for Gibbs she would suffer from dope sickness. Accordingly, there was sufficient evidence for the jury to find Gibbs was guilty of Count XI.

3.

William was the alleged victim in Count XII. William testified at trial that he met Gibbs sometime around 2018. D.I. 261 at 11–12. William sold to Gibbs on the occasion they met some speakers and then turned around and used the money

he got from Gibbs to buy heroin from Gibbs. D.I. 261 at 12–13. William was a heroin addict and suffered from dope sickness if he was unable to obtain heroin. D.I. 261 at 6. He was living at the time "on the streets and bouncing from friend to friend, house to house, couch to couch." D.I. 261 at 10. After this initial meeting, William began to buy heroin from Gibbs on a regular basis. D.I. 261 at 13. Eventually, having run out of money and "approaching a various level of sickness that [he] was not willing to be part of," William sold Gibbs his car in exchange for heroin in May 2018. D.I. 261 at 13–14; Gov't Ex. 84.

Soon thereafter, William "went and tried to talk to [Gibbs] about drugs and how we could make a plan where [William] could get drugs and make drugs happen." D.I. 261 at 20. William testified that he "offered" in exchange for drugs from Gibbs William's "mechanic-wise, drywall, [and] trade industry-wise" "abilities." D.I. 261 at 20. And according to William, Gibbs "took [William] up on doing odd jobs and work for him." D.I. 261 at 20.

Having hatched this "plan" with Gibbs, William moved into a trailer on Gibbs's property and performed various jobs on the property such as grass cutting, plumbing, fixing cars, and putting up drywall in exchange for drugs. D.I. 261 at 20–25. According to William, eventually there were not enough odd jobs to keep him busy and he was "forced to go out and boost if [he] wanted drugs." D.I. 261 at 24–25. Each day from that point, William would take a car provided by Gibbs to

retailers like Home Depot, Target, and Lowe's and steal $3,000 to $4,000 in products and bring them to Gibbs. D.I. 261 at 24–26. Gibbs would give William three to six bags of heroin for his efforts. D.I. 261 at 26.

While living on Gibbs's property, William would get dope sick two to three times each week, and he would ask Gibbs when he was sick for more drugs. D.I. 261 at 28. Gibbs would ignore these requests or tell William "to go out there and do something about it." D.I. 261 at 28.

Viewing William's testimony in the light most favorable to the government and drawing all reasonable inferences from his testimony in favor of the jury's verdict, a rational juror could conclude from this testimony that Gibbs obtained from William labor and services in the form of grass cutting, plumbing, fixing cars, putting up drywall, and boosting by a pattern of behavior intended to cause William to believe that if he did not perform this labor and services for Gibbs he would suffer from dope sickness. Accordingly, there was sufficient evidence for the jury to find Gibbs was guilty of Count XII.

4.

Christina was the alleged victim in Count XIII. Christina testified at trial that she met Gibbs on an occasion when she "was in need of drugs" and "[s]omebody she knew introduced [her] to him." D.I. 263 at 16. She first spoke to Gibbs by phone and then he picked her up on a back road and drove her to his

Lewes property. D.I. 263 at 16. Once at the property, Gibbs gave her heroin for free. D.I. 263 at 16–17. She moved in that day. D.I. 263 at 16–17. She then began boosting for Gibbs in return for heroin. D.I. 263 at 17–18. Gibbs or Waters would tell Christina what to steal from stores such as Lowe's and Home Depot, and each day, Christina would bring stolen items worth hundreds of dollars back to the property and Gibbs would provide Christina with $35 to $40 of heroin. D.I. 263 at 18–19. Gibbs withheld heroin if Christina did not "have anything for him," that is, if she did not bring him stolen items, and Christina would then get dope sick. D.I. 263 at 19–20. Gibbs observed Christina being dope sick and would call her "pitiful" when she exhibited the symptoms of dope sickness. D.I. 263 at 20–24. On one occasion when Christina left the property and obtained heroin from another dealer, Gibbs choked and hit her when she returned. D.I. 263 at 21.

Viewing Christina's testimony in the light most favorable to the government and drawing all reasonable inferences from her testimony in favor of the jury's verdict, a rational juror could conclude from this testimony that Gibbs obtained from Christina labor and services in the form of boosting by a pattern of behavior intended to cause Christina to believe that if she did not boost for Gibbs she would suffer from dope sickness. Accordingly, there was sufficient evidence for the jury to find Gibbs was guilty of Count XIII.

C.

Count XVII of the Indictment charged Gibbs with "knowingly transport[ing] [Stacey] in interstate commerce . . . from Delaware to Maryland, with the intent that [Stacey] engage in prostitution, and in any sexual activity for which any person can be charged with a criminal offense; and attempt[ing] to do so, in violation of Title 18, United States Code, Section 2421(a)." To obtain a conviction under § 2421(a) as pleaded here, the government was required to prove that Gibbs knowingly transported the alleged victim, Stacey, from Delaware into Maryland for the purpose of engaging in a commercial sex date.

The government adduced at trial evidence sufficient for a rational jury to find Gibbs guilty of Count XVII. Specifically, the government adduced evidence through the testimony of Stacey (D.I. 255 at 111–12, 126–27), Officer David Underwood of the Salisbury, Maryland Police Department (D.I. 255 at 185–90), and Special Agent Cara Rose (D.I. 254 at 11–14) that Stacey was living at Gibbs's property in Delaware on January 11, 2016 and that Gibbs drove her that day to a hotel in Maryland to engage in a commercial sex date that he had either directly or through Waters arranged.

* * * *

For these reasons, I will deny Gibbs's motion insofar as it seeks a judgment of acquittal.

II.

I turn next to Gibbs's arguments that he is entitled to a new trial. Under Rule 33, "the court may" "[u]pon the defendant's motion . . . vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions "are not favored and should be granted sparingly and only in exceptional cases." *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (internal quotation marks omitted). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). The court "can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Silveus*, 542 F.3d at 1004–05.

As an initial matter, it is clear to me that an innocent person was not convicted here. Any doubts I might have had about Gibbs's guilt were erased after I witnessed him testify at trial. That testimony was replete with admissions that corroborated the government's case, *see, e.g.*, D.I. 264 at 306–07 (admitting he supplied all the alleged victims with drugs); D.I. 264 at 137–49, 155–58, 164–67, 180, 199 (admitting to having an escorting business and to providing drugs to victims in exchange for commercial dates with men); D.I. 264 at 137–39, 146–47,

199, 229, 265, 268, 272, 278–287 (admitting all the alleged victims lived on his property); D.I. 264 at 250, 293 (admitting to being physically violent on two occasions with Stacey); D.I. 264 at 265, 274, 280–81, 284–85, 287, 307, 325 (admitting that victims boosted for him in exchange for drugs), and implausible—and thus damning—attempts at exculpatory explanations, *see, e.g.*, D.I. 264 at 267–68, 309, 315 (insisting that the sex dates he arranged for victims did not involve sex); D.I. 264 at 174 ("I was very careful to protect myself because I'm not new to criminality. So what I did is—I told Brooke to do it. I didn't do it; she did it. I wrote something down by hand. I said, 'This is a disclaimer. You get hard copies of this and you make sure every girl that goes to a date, get that signed by the person they are going to date.'"); D.I. 264 at 315 (testifying that he had drawn up a "disclaimer that provided that . . . [Marissa was] never to discuss sex or money [with a date], and that [Marissa] was supposed to have a hard copy [of the disclaimer] every time . . . [Gibbs] took Marissa to dates"). The jury and I also witnessed Gibbs engage in a volatile outburst, D.I. 264 at 255–56, and exhibit a callous, disrespectful, and imperious demeanor that was entirely consistent with the government's portrait of him as a manipulator and abuser of desperate heroin addicts.

It is also clear that there is no danger that a miscarriage of justice occurred here. On the contrary, as Gibbs himself expressly acknowledged—not once, but

three times—Gibbs received a fair trial. *See* D.I. 260 at 49:10–11 ("I like the way I'm getting a fair trial here."); D.I. 260 at 49:13–16 ("THE DEFENDANT: . . . I like the idea that I finally got a fair trial. THE COURT: Okay. THE DEFENDANT: I can say that."); D.I. 264 at 42:8–11 ("THE COURT: And I recall on Friday you talking about, and I think intelligently, that you had received a fair trial to date and that you have received -- THE DEFENDANT: I agree.").

Gibbs argues that he is entitled to a new trial "based on the Court's refusal to allow the defense to recall in its case-in-chief[] the government's principal witnesses." D.I. 276 at 1; *see also* D.I. 276-2 at 1–6. But I never refused a defense request to recall a government witness, and the defense did recall to the stand during its case-in-chief the government case agent. *See* D.I. 264 at 95. (The defense also called to the stand another government agent who had not previously testified. D.I. 264 at 51.)

Gibbs also argues that a new trial is warranted based on "the Court's refusal to provide critical jury instructions" for sixteen terms: escorting, prostitution, tricking, withdrawal, labor, services, reasonable person, force, threats of serious harm, scheme, plan, pattern, reckless disregard, coercion, fraud, and knowing. D.I. 276-1 at 3; D.I. 276-5 at 5–10, 22; D.I. 276-6 at 12, 15; D.I. 276-8 at 1–6. But I gave the jury instructions on two of the terms (coercion and knowingly) and decided without objection from Gibbs not to give instructions on two other terms

(labor and services). Gibbs did not ask for instructions on ten of the remaining twelve terms, so in point of fact, I did not refuse to provide jury instructions on fourteen of the sixteen terms in question. I did refuse to give instructions on two of the terms—escorting and prostitution. And that is because, as I explained at the prayer conference,[3] those terms are not in § 1591. The term "commercial sex act" is in the statute, and I gave the jury an instruction defining that term. D.I. 260 at 59–63; *see also* D.I. 265 at 97 (instructing jury that "[t]he term 'commercial sex act' means any sex act on account of which anything of value is given or received by any person"). More to the point, I instructed the jury fully and consistent with the applicable statutes on the essential elements of the charges, and thus the instructions I gave the jury do not provide a basis to grant a new trial.

Gibbs also says that he deserves a new trial because the government knowingly presented false testimony at trial. D.I.276-9 at 1. But he offers no proof that any witness testified falsely, and in any event, his counsel vigorously cross-examined the government's witnesses, and it was the jury's job to assess the witnesses' credibility.

Finally, Gibbs appears to argue that certain text messages, photographs, and documents were admitted into evidence without having been authenticated in

---

[3] As Judge Andrews has noted, "prayer conference" is a term used in Delaware that may not be used elsewhere. *Ingevity Corp. v. BASF Corp.*, 2023 WL 2891451, at *3 n.5 (D. Del. Apr. 11, 2023).

violation of Federal Rule of Evidence 901. There were, however, no authentication objections that I overruled at trial. Thus, I cannot be said to have erred in admitting the evidence Gibbs now challenges on authenticity grounds.

In sum, Gibbs has not identified any errors on my part or other circumstances at the trial that created a serious danger that the jury's verdict constituted a miscarriage of justice. Accordingly, a new trial is not warranted under Rule 33.

* * * *

NOW THEREFORE, at Wilmington on this Fourteenth Day of August in 2026, it is HEREBY ORDERED that Defendant's posttrial motion for a judgment of acquittal and a new trial (D.I. 276) is DENIED.

CHIEF JUDGE